IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**KBS PREOWNED VEHICLES, LLC, a West
Virginia limited liability company,**

      **Plaintiff,**

  v.           //    CIVIL ACTION NO. 1:13CV138
                          (Judge Keeley)

**UNITED FINANCIAL CASUALTY CO.,
a foreign corporation also known as
Progressive,**

      **Defendant.**

**MEMORANDUM OPINION AND ORDER
DENYING DEFENDANT'S DAUBERT MOTION [DKT. NO. 108]**

Pending before the Court is the motion to exclude the testimony of John G. Barnes (dkt. no. 108) filed by the defendant, United Financial Casualty Company ("United"). For the reasons that follow, the Court **DENIES** the motion.

**I.**

This case arises from an insurance coverage dispute between the insured plaintiff, KBS Preowned Vehicles, LLC ("KBS"), and the insurer, United. Although KBS has asserted claims for breach of contract and bad faith, the Court bifurcated the bad faith claims, and, at this juncture, only the breach of contract claim is relevant.

KBS is a motor vehicle hauling company based in Monongalia County, West Virginia. Its haulers are covered under a Commercial

**KBS PREOWNED VEHICLES, LLC v. UNITED FINANCIAL CASUALTY CO.**
**1:13CV138**

**MEMORANDUM OPINION AND ORDER DENYING DEFENDANT'S DAUBERT MOTION**

Auto Insurance Policy (the "Policy") provided by United, which includes coverage for loss to an insured automobile caused by fire. Important to this issue, however, excluded from that fire coverage are losses

> 4. Resulting from manufacturer defects, wear and tear, freezing, or mechanical or electrical breakdown or failure. But, coverage does apply if the damage is the result of other **loss** covered by the policy.

(Dkt. No. 109-2 at 3) (emphasis in original). Finally, if the fire loss is covered, United is obligated to pay "the amount necessary to repair the damaged property to its pre-loss physical condition." Id. at 4.

On May 9, 2011, one of KBS's drivers, James Allen Sims ("Sims"), was hauling vehicles from an auto auction in Buckhannon, West Virginia while driving KBS's recently purchased 2003 International 4400 Durastar Truck (the "Truck") along Route 33. Suddenly, the gauges began "acting crazy" and the Truck lost power. Sims was able to pull over onto the shoulder, at which point he noticed smoke rising from underneath the hood. When he opened the hood, Sims saw a fire in the rear of the engine compartment. He quickly grabbed the Truck's fire extinguisher and put out the flames.

Sims immediately contacted United, which had the Truck towed to Elkins Truck Service. The repair shop determined that "the cause of fire was the main hot wire from battery to starter touch the frame & shorted out started fire & oil on eng help fire along." (Dkt. No. 109-3 at 4). On May 16, 2011, a claims adjuster from United contacted KBS to inform it that "the cause is not cov[ered] & in this case the cause was the main starter wire shorted out & started fire & the wire & labor to install will not be cov[ered] as it was the cause." Id.

Although United did not cover the repairs to the wiring, it did replace the engine. However, in its amended complaint, KBS alleges that the engine United selected for replacement was of inferior quality and not identical to the previous engine.

About one year later, the engine had to be replaced again after the first replacement engine had broken down on several occasions. KBS contacted United to apprise the insurer of the issues with the replacement engine and to advise it that the Truck was experiencing problems KBS believed were related to the May 2011 fire and the burnt electrical system. For example, there were issues with the Truck's tachometer, dash lights, and headlamps. Eventually, in September 2012, the Truck became completely inoperable.

**KBS PREOWNED VEHICLES, LLC v. UNITED FINANCIAL CASUALTY CO.**
**1:13CV138**

**MEMORANDUM OPINION AND ORDER DENYING DEFENDANT'S DAUBERT MOTION**

KBS took the Truck to Hunter Truck Sales and Repair ("Hunter") in Smithfield, Pennsylvania for a diagnostic review. The repair shop determined that the Truck's wiring harness had sustained damage either from the May 2011 fire or from oil being thrown about the engine compartment due to defects in the initial replacement engine. Hunter also repaired the wiring harness at a cost of $5216.68, but refused to release the Truck to KBS until the bill was paid in full. When KBS submitted the bill to United for payment, United declined to pay because it concluded that the damage to the wiring harness was unrelated to the May 2011 fire. KBS was unable to pay the bill due to lost income because one of its haulers was inoperable and the other was repossessed.

After about four months, KBS was able to secure funds to pay the repair bill and regain the use of the Truck. However, the electrical problems persisted, and in July 2013, the Truck broke down due to engine malfunction. The Truck has been inoperable since that time.

KBS filed its initial complaint in the Circuit Court of Monongalia County, West Virginia in April 2013, several months before the Truck completely broke down. The complaint was subsequently removed to this Court, and was amended in January 2014. In its breach of contract claim, KBS alleges that, under the

**KBS PREOWNED VEHICLES, LLC v. UNITED FINANCIAL CASUALTY CO.**
**1:13CV138**

**MEMORANDUM OPINION AND ORDER DENYING DEFENDANT'S DAUBERT MOTION**

Policy, United "had the duty to restore the Plaintiff's 2003 International Truck to its pre-fire condition." (Dkt. No. 52 at 6). And according to KBS, United did not discharge its duty in this regard merely by replacing the engine.

After a discovery dispute related to KBS's expert witness disclosure, KBS filed an amended expert disclosure and report in May 2014. On August 1, 2014, United filed the pending motion to exclude the testimony of KBS's purported expert, John G. Barnes ("Barnes"), arguing that, under Fed. R. Evid. 702 and <u>Kumho Tire Co. v. Carmichael</u>, 526 U.S. 137 (1999), Barnes is unqualified to offer his expert opinions and that his opinions are unreliable.

On August 26, 2014, the Court heard oral argument on the pending motion, during which the parties agreed that the only opinion of Barnes relevant to KBS's breach of contract claim is that "[t]he 'symptoms'[1] the truck was displaying after the [replacement] engines were installed, appear to be the result of the original fire and damage to the wiring." (Dkt. No. 93-1 at 7). The Court permitted the parties to submit supplemental briefs on the admissibility of Barnes's opinion under the <u>Kumho Tire</u>

---

[1] Barnes later clarified during his deposition that, by "symptoms," he meant electrical problems. (Dkt. No. 113-2 at 14).

standard. Both parties filed supplemental briefs on September 2, 2014.

**II.**

Under Fed. R. Evid. 702, an expert witness must be qualified by "knowledge, skill, experience, training, or education." If that threshold is satisfied, the expert may offer testimony in the form of an opinion, but only if all of the following are true:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

The current version of Rule 702, as amended in 2000 and 2011, reflects the Supreme Court's decision in Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993), and its subsequent decision in Kumho Tire. See Fed. R. Evid. 702 advisory committee's note. Under the Daubert standard, "the trial judge must determine at the outset, pursuant to Rule 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier

6

of fact to understand or determine a fact in issue." 509 U.S. at 592. In Kumho Tire, the Supreme Court held that all "specialized testimony" must be "reliable and relevant," regardless of "whether the testimony reflects scientific, technical, or other specialized knowledge." 526 U.S. at 149.

The mechanism by which courts perform this gatekeeping function is found in Fed. R. Evid. 104(a), which requires courts to decide "any preliminary question about whether a witness is qualified, a privilege exists, or evidence is admissible." The proponent of the testimony bears the burden of proving the expert's qualifications and the reliability of the opinions by a preponderance of the evidence. See Daubert, 509 U.S. at 592 n.10 (citing Bourjaily v. United States, 483 U.S. 171, 175-76 (1987)); Cooper v. Smith & Nephew, Inc., 259 F.3d 194, 199 (4th Cir. 2001).

**III.**

**A. Qualifications**

United seeks to exclude Barnes's opinion, in part, based on his qualifications. From 1983 to 1994, Barnes drove trucks for a living. During the four-year period between 1989 and 1993, he also managed a fleet of trucks for Capital City Distribution, Inc. Beginning in 1997, he worked as a commercial auto insurance underwriter before opening his own consulting firm in 2007. United

7

questions whether this experience qualifies Barnes to opine on the causative link between the May 2011 fire in the Truck's engine compartment and the subsequent problems. According to Barnes, he is qualified to opine on the causation issue based on "30 years of experience in the trucking industry." (Dkt. No. 93-1 at 7). Moreover, Barnes asserts that "I have operated numerous trucks with Engine Control Modules, . . . [and] I have seen every kind of failure of these components." Id.

During oral argument, the Court indicated to counsel for United that, in the Court's view, Barnes's qualifications are sufficient. United's supplemental brief does not persuade the Court otherwise. During his deposition, Barnes testified that he has "experience with vehicles that have had fires in the fleets that I've managed in the past." (Dkt. No. 109-5 at 5). His experience also includes "years of operating a number of commercial vehicles and having direct experience with trucks that have electrical problems, fires and other issues." Id. at 20. Moreover, Barnes has "decades" of experience "running lots of commercial vehicles that have experienced fires and electrical problems." Id. at 21-22. Finally, as a fleet manager, Barnes oversaw repairs to the trucks:

> [L]et me clarify that as part of fleet management is that over the years of being in the truck industry, in the trucking industry, is that I was responsible for the vendors that repaired the vehicles. I made repair decisions. I would be involved in direct review of any kind of repairs to trucks. So on a daily basis it would be -- come across my desk would be phone calls or e-mails from suppliers or vendors on repairs. . . . So over the years I've become very familiar with all -- you know, the function of trucks, how to maintain them.

Id. at 27-28.

United urges that, despite Barnes's extensive background with truck repairs and his particularized experience with fire-related damages to electrical components in trucks, he is not a mechanic and has never dealt specifically with diesel trucks like the one at issue. The level of specialization demanded by United, however, is far greater than that demanded by law. "An expert need not necessarily have specific experience with a particular facet of his or her expertise in order to be competent to testify as to that facet," and "[a] lack of specialization generally does not affect the admissibility of the opinion, only its weight." Loeffel Steel Prods., Inc. v. Delta Brands, Inc., 372 F. Supp. 2d 1104, 1113 (N.D. Ill. 2005) (internal quotation marks and citations omitted); see also Dreyer v. Ryder Auto. Carrier Grp., Inc., 367 F. Supp. 2d 413, 417 (W.D.N.Y. 2005) (finding an expert qualified to opine on a design defect of autohaulers based on his general experience

9

loading, unloading, and operating autohaulers); Smith v. Ford Motor Co., 882 F. Supp. 770, 772-73 (N.D. Ind. 1995) (permitting an expert to testify as to the cause of a truck fire based on his experience in the auto collision repair industry); Mason v. E.L. Murphy Trucking Co., 769 F. Supp. 341, 344 (D. Kan. 1991) (finding an expert qualified to opine on unique markings of a transportation trailer based on nineteen years of "practical experience" operating and maintaining transportation trailers).

**B. Reliability**

In addition to being qualified, an experiential witness must demonstrate how his experience leads to his conclusion, and how his experience is reliably applied to the facts. See United States v. Wilson, 484 F.3d 267, 274 (4th Cir. 2007). That said, "[a] district court's reliability determination does not exist in a vacuum, as there exist meaningful differences in how reliability must be examined with respect to expert testimony that is primarily experiential in nature as opposed to scientific." Id.

During his deposition, Barnes explained precisely how his experience led him to his conclusion that the Truck's subsequent problems were caused by the burnt electrical wiring:

> This would be strictly from my expert experience and over
> the years of operating a number of commercial vehicles
> and having direct experience with trucks that have

>       electrical problems, fires and other issues. These
>       problems, if they are not corrected at the beginning or
>       there's fire damage that isn't repaired due to the
>       complexity of all the electronics and the wire harnesses,
>       they become a continuous maintenance problem. That's
>       what I see is happening here in this -- at this point.

(Dkt. No. 109-5 at 20-21).

As to Barnes's methodology, United argues that the basis of his opinion is the claim file, which concludes that the subsequent problems with the Truck "are not in any way related" to the May 2011 fire or the covered repairs. (Dkt. No. 113-1 at 4). Additionally, United points out that Barnes conceded the claims adjuster who inspected the Truck was in a better position than Barnes to determine whether the electrical problems were related to the original fire. (Dkt. No. 113-2 at 11).

United's points are well-taken. Nevertheless, Barnes's opinion is not unreliable simply because he disagrees with the opinion of the claims adjuster or the notes in the claim file. In forming his opinion, Barnes studied the claim file, viewed photographs of burnt wiring and fire damage to the Truck's engine compartment, and read Sims's deposition testimony transcript discussing the lack of problems with the Truck prior to the fire. After reviewing all these materials, and based on his experience, Barnes concluded that the Truck's electrical problems were caused

by damage to the wiring from the May 2011 fire. There is nothing unreliable about this methodology. Although United points out purported weaknesses in the basis of Barnes's opinion, "'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'" United States v. Crisp, 324 F.3d 261, 269-70 (quoting Daubert, 509 U.S. at 596).

**IV.**

Therefore, for the reasons discussed, the Court **DENIES** United's motion.

It is so **ORDERED.**

The Court directs the Clerk to transmit copies of this Order to counsel of record.

DATED: September 5, 2014.

/s/ Irene M. Keeley
IRENE M. KEELEY
UNITED STATES DISTRICT JUDGE